## THE ASHER J. HUDSON.

(District Court, S. D. New York. February 27, 1906.)

TOWAGE—ABANDONMENT OF TOW—LIABILITY OF TUG.

An iron barge laden with lumber, while being towed with another barge from a Virginia port to New York, began to leak, and on signal the tug took off her crew, but proceeded with the towing until some time in the night, when the hawser parted, and the barge went adrift somewhere below Sandy Hook, but was not missed until the next morning. The tug proceeded with her other tow to New York, and then went in search of the lost barge, which was found in the possession of salvors. *Held*, on the evidence, that the leaking condition of the barge was not caused by her striking bottom during the towage as alleged, and, in view of the belief of the master of the tug, and of the barge as well, that the barge had foundered because of her iron construction, that the tug was not in fault for not sooner going to her rescue.

In Admiralty. Action against tug for damage to tow and cargo. Questions of fact with reference to fault in abandonment of iron barge in tow, and failure to seek for it subsequently, determined in favor of the tug.

James J. Macklin and La Roy S. Gove, for libellants.
Moen & Kilbreth and Edward R. Baird, Jr., for claimant.

ADAMS, District Judge. This action was brought by Peter Hagan and John J. Hagan, the owners of the barge Centipede and bailees of 385,000 feet of lumber on board, to recover from the tug Asher J. Hudson, the damages suffered by reason of the abandonment of the barge and cargo, while being towed from Portsmouth, Virginia, to New York, in August, 1901. The tow consisting of this barge and the barge R. J. Camp, was towed tandem on hawsers, the Camp being about 150 fathoms behind the tug and the Centipede

about the same distance behind the Camp. The tow started in the morning of August 4th, and on the following morning, about 8 o'clock passed about 2 miles to the eastward of the Winter Quarter Light-ship, on a N. E. by N. heading, the usual course with the wind from the eastward, some allowance being made for leeway. The libellant contends that at this point a course was taken to the westward which brought the barge upon some shoals and seriously injured her bottom so that she leaked and subsequently became in a sinking condition.

The libel alleges in this connection:

"Third: Upon information and belief libellants allege: That on or about the 3rd day of August, 1901 the said barge 'Centipede' being in a good and sound condition and laden with said cargo of lumber was taken in tow by the said steam tug 'Asher J. Hudson' at Portsmouth, Va., bound for the Port of New York; that said steamtug also took in tow another barge which was made fast to the stern of the said tug by a hawser, the distance be-tween the stern of the said steamtug and said first barge on said hawser being about 400 feet and that said barge 'Centipede' was made fast to said leading barge, the space between the said barges being also about 400 feet. That said tug and said tow proceeded from the said Port of Portsmouth, Va., and anchored on the flats known as the Atlantic City Flats at Norfolk, Va., and started therefrom on the morning of the 4th of August for the said Port of New York, and continued on her said trip with said barge in safety, but on reaching what is known as the locality of Winter Quarter Shoals, the said steamtug instead of pursuing the usual and customary course where there was sufficient depth of water, edged in and on to the said Winter Quarters Shoals, where the said barge 'Centipede' struck bottom, immediately causing her to leak, which occurred at about 8 o'clock a. m. of August 5th, whereupon the said steamtug was signalled by the said barge, but that no attention was paid thereto, the said steamtug and her tow at the time being in a position to put into, in safety (outside of the damage done her by touch-ing bottom) Chincoteaque Inlet, which would have taken but a very short time, but that said steamtug continued on with her said barges, continuous pumping being necessary on said barge to keep her afloat, the said leak con-tinuing to increase from the damage she had received as aforesaid, and when off Delaware Breakwater, the leaking still increasing and the sea becoming rough, the said steamtug was again signalled, but that no heed was paid thereto, although she could have put in with said barge into the said Delaware Breakwater, but instead thereof the said tug proceeded on until about 40 miles to the southward and eastward of Sandy Hook, and very much out of the usual course pursued by tugs and tows, when the said steamtug at about 6:30 o'clock of the morning of the 6th day of August, took the crew of the said barge on board the said steamtug and abandoned the said barge, and the captain of the steamtug although being requested to put the remaining barge in a place of safety and return to the assistance of the 'Centipede,' re-fused to do the same and continued on with the leading barge to the Port of New York.

That said barge 'Centipede' was finally picked up by a schooner and with her assistance and the subsequent assistance of a steamtug and wrecking appliances afterwards obtained, was finally, with her cargo, towed into New York. The services of the said schooner, steamtug and wrecking appliances being made the subject of a salvage service against the said barge and her cargo. That upon subsequent inspection of the said barge it was found that she was damaged amidships, her timbers being broken on a line with the cen-ter of the said barge, forward and aft.

Fourth: Upon information and belief libellants allege that said damage to said barge was caused through the fault negligence and carelessness of those in charge and controlling the said steamtug.

(1) That those in charge of her navigation were incompetent, she hav-

ing no licensed man on board, covering the waters where she took bottom.

(2) In running out of the usual course and touching bottom at Winter Quarters Shoals,

(3) In not heeding the signal from the said barge."

[This charge of fault was withdrawn on the trial.]

"(4) In not putting into Chincoteaque Inlet,

(5) In not putting into Delaware Breakwater or rendering any assistance to the said barge,

(6) In not taking the remaining barge and placing her in some safe quarter so as to return for the said barge 'Centipede' and take her in tow."

The answer alleges as follows:

"On or about August 3, 1901, the tug Asher J. Hudson with the barge R. J. Camp and the barge Centipede, Proceeded from Portsmouth, Virginia, and anchored on the Atlantic City Flats, at Norfolk, Virginia, whence she started on the morning of August 4th for the port of New York, having in tow the R. J. Camp and Centipede in tandem in the order named, the Centipede being on her own hawser.

The tug and tow proceeded on the voyage, passing the Winter Quarter Shoals about eight a. m. on August 5th, holding a usual and customary course, and leaving the lightship about two miles to the westward on the port hand. All went well that day and the following day, August 6th, until about 3 p. m., when the weather being stormy and the sea rough, distress signals were seen on the Centipede, which was reported by her crew to be leaking badly. The tug succeeded with much difficulty and at great risk in getting the hawser of the Camp aboard and in approaching the Centipede which was then abandoned by her master and crew, who jumped or were hauled on board the tug by heaving lines. The barges, running before the wind and sea were heading on a dangerous coast and it was with much difficulty and great risk to all that the tug got a hawser to the Camp again and resumed the voyage, with the Centipede still in tow behind the Camp, at about 5:30 p. m. At this time there was no harbor nearer than Sandy Hook, about thirty-seven miles to the north and Delaware Breakwater about eighty-three miles to the south.

When abandoned by her master and crew the Centipede was reported by them to be leaking badly and in great danger of foundering before morning on account of her iron hull, and there being no one on board in charge of her wheel she sheered and was buffeted about by the heavy seas so that her hawser was chafed and parted at her bow chock during the night.

The tug arrived in New York without further incident on the morning of August 7th and after safely disposing of the R. J. Camp, left New York to find and render assistance to the Centipede in case she had not foundered. The tug found the Centipede in tow of a schooner and tug off Long Branch and offered assistance, which was refused. In the course of the said towing by the said schooner and tug the said barge sustained further damage, particularly by hitting the bottom and sinking in New York Bay."

The testimony on each side supports the diverse allegations. The questions involved, relate principally to the course taken by the tug after passing Winter Quarter Lightship and to whether proper efforts were made by the tug to rescue the barge, when it was found she was still afloat.

It appears clearly enough that the tug pursued a safe course, that is, she did not turn to the westward after passing the lightship but kept a course that kept the tow clear of all shoals. The accident was probably due to the leaky condition of the barge and lack of adequate pumping. Her bottom was injured by getting ashore somewhere after the voyage commenced but it appears that when she was picked up and brought into New York Harbor, she had been ashore

for some time and that is sufficient to account for the condition of the bottom. The first intimation that the barge was in trouble reached the tug the evening of the 6th, when a passing steamer, which was signalled by the tug, having failed to help the barge, the tug caused the Camp to get up her head sails and herself went to the assistance of the Centipede and succeeded, with considerable difficulty and some danger, in getting a line to the barge by means of which the crew of the barge, through leaping overboard, were rescued and taken on the tug. The voyage was then resumed with both barges in tow but during the night, the Centipede parted her hawser, and it was not until the following morning that she was missed by the tug. When the crew of the barge was removed, the master stated that she was leaking badly and expressed the opinion, in substance, that she could not be saved, upon which the master of the tug relied. His own judgment also was that an iron hulled vessel in her condition would sink and he concluded to proceed on his voyage. The barge's pumps were worked by steam but seem to have thrown but a small stream of water and proved insufficient to keep her free. The weather was bad also and while not of itself a cause of loss, it doubtless contributed thereto. It is impossible in view of all the evidence to believe that the barge struck bottom when drawing no more, if as much, water as the vessels which preceded her in the tow, went through safely, therefore this branch of the case must be decided against the libellant.

Whether proper efforts were subsequently made by the tug to rescue the barge is more difficult to determine. The master of the tug doubtless supposed she was sunk, although lumber laden, which, as well known, ordinarily supports a wooden vessel for some time. What effect such a load has upon an iron vessel does not appear to be as familiar to sea going masters. The master, here, however, when he heard the barge was still afloat, after some hesitation, did go to her aid, but found her in the possession of salvors, who refused to deliver her to the tug or accept any assistance from it. There was not much time lost after the master discovered that the barge was still afloat. If he had started immediately, the situation would probably have been the same. The tug was apparently not in fault for the hesitation about seeking the barge at that time. Whether she was delinquent in not anchoring the Camp inside of Sandy Hook and seeking for the Centipede from there is not so clear. In view of the fact, however, that the barge was iron, and it does not appear how long vessels of that character will float with lumber cargoes, nor how long the barge had been in the possession of the salvors, the case is too doubtful to admit of fixing any liability upon the tug.

The libel is dismissed.